
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| GEODESIC CONSULTING, LLC, | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | 2:15-cv-01225-LSC |
| COMPASS BANK, | ) ) | |
| Defendant. | ) ) | |

**Memorandum of Opinion**

Plaintiff Geodesic Consulting, LLC ("Geodesic") brings this action under the Court's diversity jurisdiction and alleges various state law claims against Defendant Compass Bank ("Compass"). Before the Court is Compass' Fed. R. Civ. P. 56 renewed motion for summary judgment (doc. 84) on all claims asserted in Geodesic's second amended complaint (doc. 76). Also pending is Compass' motion to strike. (Doc. 92.) The issues here have been fully briefed by the parties and are now ripe for review. For the reasons stated below, Defendant's renewed motion for summary judgment is due to be denied as to all claims except Count III, and their motion to strike is due to be terminated as moot.

## I. Background[1]

### a. Factual Background[2]

Geodesic Consulting, LLC, the U.S. affiliate of a Spanish entity Geodesic Consulting, SL, an IT consulting service provider, had agreements for provision of IT services with Compass Bank. Geodesic was required to accomplish the relocation of a key employee from Spain to Birmingham, Alabama for work on a project. The suit arises out of disputes surrounding that employee's relocation as well as the agreements between the parties and payment for services rendered.

#### i. Syncada

Compass Bank was one of a number of banks in discussions with Syncada, LLC regarding participation in "Syncada" a global financial supply chain processing network. In February 2013, Basava Kore ("Kore"), an IT Director at Compass, corresponded with David Baeza-Rojano ("Rojano"), a Spanish national,

---

[1] In ruling on a motion for summary judgment, this Court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the . . . motion." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). Thus, if the parties' versions of the facts differ with regard to a particular issue, this Court accepts the nonmoving party's version as true. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013).

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

about providing consulting services for Compass on the Syncada Project. Rojano had previously done work for Compass through one of his former employers. Kore, on behalf of Compass, entered into discussions via telephone and email with Estella Luna de Maria ("Luna") about procuring her company's services. Luna is CEO of Geodesic. The substance of those discussions revolved around whether Geodesic would relocate Rojano to the United States to work on the Syncada Project. In conformance with typical consulting employment arrangements in the IT field, Rojano was not employed by Compass—but was instead employed by Geodesic, who would in turn contract with Compass for the IT services Rojano would provide through Geodesic. Rojano and Geodesic entered into an employment agreement in April of 2013 in which Geodesic agreed to pay certain expenses and provide compensation to Rojano for his work at Compass as an employee of Geodesic.

Meanwhile, negotiations between Compass and Syncada were ongoing even though Compass had been encountering delays in securing a contract with Syncada since December 2012. On March 15, 2013, Kore was included as part of a series of internal emails which disclosed news signaling that the Syncada Project would not be going forward. The email read in pertinent part: "Syncada not providing financials prior to signing a contract with them is a show stopper." (Doc. 47-3, Ex.

B-37[3].) The emails also expressed concerns over Syncada's general lack of profitability and funding. This news was not disclosed to Luna or Rojano.

The Syncada Project had an expected launch date of May 1, 2013. Kore and Luna exchanged many e-mails in the months preceding the kickoff. In an e-mail dated April 11, 2013, Kore told Luna the contract with Syncada had not yet been signed and the "[e]xpectation [was] it could take another 2 weeks before they close the agreement. The date has not been adjusted. 1st May is still the target for kick-off. Will update as I know more." (Doc. 47-5, Ex. C-9.) In response, Luna acknowledged her awareness that the contract had not yet been signed. *Id.* On April 18, 2013, Luna inquired as to the status of the project. Kore responded that there was no confirmation of a signed contract, funding was not yet available, and that it might be best to put off the date for Rojano traveling to the U.S. The email concluded with, "**Syncada contract and funding anticipated for end of next week**" which was both emphasized in bold and in a larger font. (Doc. 47-5, Ex. C-13.) Another email exchange between Rojano and Kore seems to have indicated a confirmed start date. On April 4, 2013, Rojano sent an email to Kore which began with, "I'm delighted in hearing from Estella [Luna] that the kick off date is finally confirmed as on May 1st." (Doc. 47-5, Ex. C-11.) Kore did not respond until April

---

[3] Unless otherwise noted, pinpoint citations refer to CM/ECF document stamp pagination.

16, he stated, "Sorry David I thought I had responded. I agree. Will organize meeting with key people in the first week and get a good understanding of the scope." *Id.*

On April 23, 2013, more emails were exchanged between Kore and Luna regarding the status of Syncada. Luna asked Kore to keep her updated with any relevant news from his side. Kore's response told Luna the contract was still unsigned; while the expectation of project cancelation was very low, the probability of a start date of May 1 was also very low; he would not be able to sign any agreements with Geodesic until Compass completed the contract with Syncada; and funding would not be released until the official kick off. (Doc. 47-5, Ex. C-14.) Kore then listed two options: "1. David to start May 1 .. orientation until official start; 2. David to arrive 2 weeks into May.. after Syncada contract is signed." *Id.* Neither option indicated that the contract was in jeopardy. The email concluded with a quoted portion presumably from another email stating,

> I do <u>not</u> think that there is any significant risk that we will not be going forward with the Syncada Project, the issue at this point is timing. We should finalize the contract soon (hopefully this week), but the timing may be extended . . . May 1st is possible, but probably not realistic. The following week is probably a safer estimate, although not 100% firm for the reasons previously detailed.

*Id.* (emphasis in original). At this point, Geodesic had already incurred expenses in connection with Rojano's upcoming relocation from Spain to the U.S.—including

plane tickets and visas for Rojano and his family, as well as apartment and automobile rentals. After consideration, a decision was made to relocate Rojano to the United States so he would be in place on the projected launch date, May 1st. Geodesic made this decision so as to not expend more resources on the relocation than had already been expended, and out of prudence should Rojano be required for work on the project if it kicked off on the expected date. He arrived in Birmingham, AL, on April 30, 2013, and began work with Compass.

On May 10, 2013, Compass learned VISA was likely pulling out of the joint venture, negotiations had come to a complete halt, and the Syncada Project would not be going forward. Two weeks later, on May 28, 2013, Kore informed Luna via email that negotiations had halted. The Syncada Project was cancelled; consequently, no agreement between Geodesic and Compass was finalized regarding Syncada.

### ii.     The ARP Project & the Basel III Project

After cancellation of the Syncada Project, in late May 2013, Kore offered Geodesic the opportunity for Rojano to work on a different project known as the ARP Project. On July 16, 2013, Compass and Geodesic entered into a Master Services Agreement ("MSA") and a Mutual Nondisclosure Agreement ("NDA") in connection with its approval as vendor on the ARP Project which was slated to

receive funding on June 14, 2013. The MSA included a "Non-Solicitation" paragraph providing:

> During the term of this agreement and for a period of one year following any termination of this Agreement, neither Party will directly or indirectly through third parties solicit or hire for employment any of the other party's current or previous employees (unless a period of twelve months had elapsed from the last date that the employee was employed by the other Party). This provision will not apply to, and will not prevent the hiring of any person responding to, general advertisements of employment opportunities.

(Doc. 52-2 at 16.) It also included provisions requiring Compass to provide payment to Geodesic within 45 days of services being rendered. (Doc. 47-3, Ex. B-24 ¶ 8.c.) Paragraph 16 of the NSA provides as follows:

> Neither party shall hire or solicit, for itself or any other person or entity, directly or indirectly, any person who was employed or engaged as a consultant of the other party within one (1) year of the date of this Agreement.

(Doc. 52-3 at 4, ¶ 16.)

On June 7, 2013, Luna sent an email to Kore regarding payment for services Rojano provided to Compass prior to the once anticipated kickoff of Syncada. She concluded with, "I know you said there is no available budget to pay this effort, but I would like you to kindly consider a way to get this work reimbursed as it was relevant work for the project and not only occasional help." (Doc. 47 at 279, Ex. C-22.) Kore rejected this request and stated that the date to start charging for the

hours of Rojano was June 17th. However, on September 23, 2013, a purchase order numbered 181329 ("PO181329") was issued by Compass for work done by Rojano from May 1, 2013 until September 23, 2013. In response, Geodesic issued seven invoices to Compass specifically requesting payment by wire transfer. However, Compass tendered payment via official Compass checks which were subsequently dishonored. After several months of repeated requests for payment, including a follow-up trip by Luna to the U.S., and after being required to sign lost instrument indemnity documents for Compass, Geodesic received a wire transfer from Compass in the amount of $122,040.00 on February 4, 2014, for payment of six out of the seven invoices. Invoice No. 6, which was issued in response to PO181329, in the amount of $35,840.00 remains outstanding and unpaid.

On September 4, 2013, after months of work on the ARP Project with Geodesic, Rojano informed Kore of his intent to resign from his employment with Geodesic effective September 6, 2013, because of disagreements over expenses— some of which were connected to family health insurance coverage. When Luna learned of Rojano's intentions, she flew to the U.S. for a meeting with Rojano and Kore in which they negotiated a delay of his separation date and for Geodesic to provide family health insurance effective October 1, 2013. As to not interrupt his work on the ARP Project, Rojano continued working for Geodesic until November

30, 2013, at which point he separated from his employment with Geodesic. During the time frame before his official separation from Geodesic, Compass employees assisted Rojano in the process of having NFQ Advisory Services U.S., LLC, an affiliate of Nfoque Advisory Services ("Nfoque"), which is Geodesic's competitor, approved as a vendor in Compass' procurement system. Compass did this after being informed of Rojano's intention to quit Geodesic and begin work with Nfoque on another project for Compass called Basel III. Throughout September, Luna made representations to Compass that she would not involve them in litigation regarding the breakdown of the employee-employer relationship with Rojano. However, these were made without her knowledge of the communications between Rojano, Kore and other Compass employees about Rojano continuing work for Compass via Nfoque, its competitor. Geodesic filed this lawsuit on June 23, 2015 in the Circuit Court of Jefferson County, and Compass removed the action to this Court on July 22, 2015.

## II.    Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1049 (11th

Cir. 2015). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* The trial judge should not weigh the evidence, but determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.*

A motion for summary judgment is due to be granted upon a showing that "no genuine dispute as to any material fact" remains to be decided in the action and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)[4]. A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). The Court must "avoid weighing conflicting evidence or making credibility determinations." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287 (11th

---

[4] Although Fed.R.Civ.P. 56 was amended on December 1, 2010, "the standard for granting summary judgment remains unchanged." Fed.R.Civ.P. 56 advisory committee's note (2010 Amendments).

Cir. 2013) (citing *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480 (11th Cir. 1985)).

## III.    Discussion

Defendant Compass asserts summary judgment is due to be granted on each of Plaintiff Geodesic's claims. Each of Plaintiff's claims for relief will be addressed in turn below.

### A.    Common Counts: Open Account, Account Stated, & Value of Work and Labor Done

Geodesic alleges Compass owes it a sum in the amount of $35,840.00 due by open account, account stated, and for work and labor done for Compass from May 1, 2013, through June 14, 2013. In *Car Center, Inc. v. Home Indem. Co., Inc.*, the Alabama Supreme Court cites the Alabama Court of Civil Appeals explaining, "[a]n account stated is a post-transaction agreement. It is not founded on the original liability, but is a new agreement between parties to an original account that the statement of the account with the balance struck is correct and that the debtor will pay that amount." 519 So. 2d 1319, 1322 (1988) (citing *Univ. of S. Ala. v. Bracy*, 466 So. 2d 148, 150 (Ala. Civ. App. 1985)).

> A prima facie case on an account stated is made when the plaintiff proves (1) a statement of the account between the parties is balanced and rendered to the debtor; (2) there is a meeting of the minds as to the correctness of the statement; and (3) the debtor admits liability. The debtor's admission to the correctness of the statement and to his

liability thereon *can be express or implied*. An account rendered, and not objected to within a reasonable time becomes an account stated, and failure to object will be regarded as an admission of correctness of the account.

*Id.* (citations omitted) (emphasis added).

The parties do not dispute that Invoice No. 6 remains unpaid in the amount of $35,840.00. However, Compass disputes whether or not it is warranted and owed to the Plaintiff. Geodesic sent Invoice No. 6 in response to a PO181329. Compass points to the email exchange between Luna and Kore in which she admits there is no available funding for the efforts expended by Rojano during the relevant time frame but asks Kore to reconsider. Another email exchange references Luna responding to Kore saying the date to start charging for David (Rojano) is June 17th, 2013, with "Thank you Bas for your interest in us." (Doc. 47-5, Ex. C-23.) Compass contends these communications preclude a meeting of the minds regarding payment. However, taking the facts in a light most favorable to Geodesic, a jury could find that upon a request by Luna for reconsideration of the billable nature of work done from May until June by Rojano, that Compass changed its mind and the P.O. by Compass was evidence of its decision to compensate Geodesic for the work done during that time frame. The P.O. and the subsequent Invoice by Geodesic could be categorized as a post-transaction agreement for which Geodesic has a claim for open account. Further, Compass' issuing of the P.O. after

the conversations between Luna and Kore could amount to an implied admission of

liability on an account stated.

Compass asserts Geodesic cannot capitalize on its mistake to their benefit

because Geodesic knew or should have known of the mistake. Compass cites

*Montgomery v. Strickland*, 384 So. 2d 1085, 1086-87 (Ala. 1980), it support of its

argument:

> If one of the parties, through mistake, names a consideration that is *out
> of all proportion to the value of the subject of negotiation* and the other
> party realizing that a mistake must have been committed, takes
> advantage of it and refuses to let the mistake be corrected when it is
> discovered, he cannot under these conditions claim an enforceable
> contract.

(quoting *Bd. of Water & Sewer Comm'rs of the City of Mobile v. Spriggs*, 146 So. 2d

872 (Ala. 1962)). The Court is not convinced that the P.O. issued by Compass

reflecting a start date of May 1 was "out of all proportion to the value of the subject

of negotiation." *Id.* The record reflects both parties anticipated Rojano's beginning

work for Compass on May 1 and Geodesic spent considerable effort to ensure he

was available on that date. Rojano did indeed render services to Compass beginning

on May 1, 2013. It is not completely out the question for Geodesic to believe he

would be entitled to compensation for such work. There are genuine disputes of

material fact surrounding the claims for these common counts, precluding

summary judgment on those claims.

## B. Suppression

In Count IV, Geodesic alleges Compass suppressed facts that were material to the Syncada Project. Under Alabama law, establishing a claim of suppression requires a showing "(1) that [the defendant] had a duty to disclose the existing material fact; (2) that [the defendant] suppressed this material fact; (3) that [the defendant's] suppression of this fact induced [the plaintiff] to act or to refrain from acting; and (4) that [the plaintiff] suffered actual damage as a proximate result." *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 837 (Ala. 1998); *see also* Ala. Code § 6-5-102 (1975).

### 1) Compass had a duty to disclose a material fact

"[W]hether a party had a duty to disclose is a question of law to be determined by the trial court." *Barnett v. Funding Plus of Am., Inc.*, 740 So. 2d 1069, 1074 (Ala. 1999). The Court must consider and apply the following factors in determining whether, under the particular circumstances, a duty to disclose exists: (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) customs of the trade; and (6) other relevant circumstances. *Owen*, 729 So. 2d at 842–43; *Davis v. Sterne, Agee & Leach, Inc.*, 965 So. 2d 1076, 1091 (Ala. 2007) ("A duty to speak depends on the relation of the parties, the value of the particular fact,

the relative knowledge of the parties, and other circumstances.").

The analysis begins with an evaluation of the relationship of the parties. Both Geodesic and Compass were commercial entities transacting business. In *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.,* 932 So. 2d 883, 992 (Ala. 2005), the Alabama Supreme Court "explained that, in a commercial transaction involving arm's length negotiations, the parties have no general obligation to disclose any specific information to the other, but each has an affirmative duty to respond truthfully and accurately to direct questions from the other." *CNH America, LLC v. Ligon Capital, LLC*, 160 So. 3d 1195, 1203 (Ala. 2013). Evidence on the record reflects Compass disclosed its general difficulty in finalizing the contract with Syncada. However, Geodesic insists Compass was duty-bound to disclose the information contained in the March 15, 2013 emails. Thus, the question of whether Compass had a duty to disclose depends on (1) whether Geodesic inquired about the status of the Syncada project and (2) whether Compass "answered any such questions truthfully and accurately." *Id.* Geodesic asked on a regular basis about the progress of Compass' contracting with Syncada. Given that failure to provide financials, by Kore's own admission, was a "show-stopper" on the contracting process between Compass and Syncada, not disclosing such news to Geodesic in response to their inquiries render Compass' responses

untruthful and inaccurate. (*See* Kore Depo. at 161-62.) Luna testified she inquired weekly as to how negotiations with Syncada were going and asked whether there had been any pertinent updates. While Kore responded to these emails, no mention was ever made about Syncada's failure to provide its financials, nor the implication that fact had on the deal. Even with the commercial nature of the parties' relationship, Kore should have apprised Luna of such news.

Syncada's refusal to provide its financials to Compass resulting in a halt of the deal going forward, if true, is obviously material to Geodesic. Geodesic alleges it would have acted differently had it received notification of such a development, and thus the March 15th information was valuable. Kore admits news contained in the March 15, 2013, email was "pretty important." (Kore Dep. 161-66.) The fact that a full month elapsed between the March 15th emails and the time Geodesic finalized logistics surrounding Rojano's relocation in April is also consequential.

Next, the Court looks to Geodesic's opportunity to ascertain the allegedly suppressed fact. Geodesic asserts it would have had no way to procure the information on its own. Though, as Compass points out, Geodesic "is a sophisticated commercial party with extensive knowledge regarding consulting agreements in the IT field," the record indicates it was not party to the specific negotiations with Syncada, and was dependent upon Compass to keep it abreast of

developments. (Compass' Summary Judgment Brief, Doc. 85 at 20.) "Where the accused has superior knowledge of the suppressed fact and the defrauded party has been induced to take action which he *might* not otherwise have taken, the obligation to disclose is particularly compelling." *Dominick v. Dixie Nat. Life Ins. Co.*, 809 F.2d 1559, 1570 (11th Cir. 1987) (emphasis added) (citation omitted). Given the nature of the relationship of the parties to the transaction, a jury could conclude Compass had "superior knowledge of the suppressed fact," and was under a duty to disclose the "show-stopper" news to Geodesic. *Id.*

The next consideration is customs of the trade. Geodesic admits the absence of a signed contract before beginning work on a project in the IT field is typical. Compass argues this indicates Geodesic would have moved forward with plans to relocate Rojano regardless of whether they had disclosed the "show stopper" email information. However, other evidence in the record tends to indicate that reliance upon the representations of a client like Compass for whom a consulting company like Geodesic is working towards providing services for was also typical. Geodesic communicated its expectation that Compass disclose material developments. Geodesic asserts it relied upon Compass' professed values of transparency, honesty and truthfulness in its dealings. (Kore Dep. at 49-50.) Even with Geodesic's concession about the typicality of engaging work with a client in the

absence of contract confirmation, a jury could find that its reliance upon Compass' representations about the forthcoming deal with Syncada despite the delays was not outside the trade custom, was reasonable, and tends toward a showing of Compass' duty to disclose.

It is worth noting other relevant circumstances. The first is that the parties were communicating and translating between English and Spanish as both Luna and Rojano are native Spanish speakers. Second, the parties were communicating primarily via email and intermittently via telephone from separate continents. Both of these circumstances counsel towards a finding that Compass was under an obligation to be particularly frank in its communications with Geodesic.

### 2) Compass suppressed material fact

The information contained within the March 15 internal email was pertinent to the viability of the Syncada Project with Compass and could therefore be deemed material to Geodesic.

### 3) Act or refrain from acting

As reflected in an email from Luna to Rojano dated Thursday, April 11, 2013, Luna directed Rojano "to look for tickets and a rental car as if we're going on May 1 . . . ." (Doc. 47, Ex. C-10.) This email was sent later the same day after Luna received the April 11 email from Kore conveying that the contract had not yet been

signed, but the launch date had not been adjusted. Given that Luna was under an obligation to have Rojano present in Birmingham should the project kick off the anticipated date, it would be reasonable for Luna to move forward with plans for Rojano's relocation in reliance on Kore's repeated communication that the expected kick off date was still May 1st and Kore's suppression of the actual difficulties with the Syncada contract. Kore testified in his deposition that he expected Rojano, as part of the Syncada team, to "hit the ground running when the project kick[ed] off." (Kore Dep. at 118.) Geodesic has provided enough evidence to show it would have acted differently in April had it been apprised of the truth concerning the Syncada Project.

**4) Geodesic suffered actual damage as a proximate result.**

Without a project for Rojano to work on at Compass, Geodesic would have had no reason to send him to the U.S. In an email from Kore to Rojano on April 18, 2013, Kore expressed hesitancy about sending Rojano and his beginning May 1st. (*See* Doc. 47, Ex. C-12) (". . . final arrangements are not complete yet. They are expected to close end of next week. I am worried cutting this so close…May be better off to put off for 2 weeks to make sure all funding is in place. Sorry for these delays.") Rojano responded by telling Kore that a delay would create logistical problems because they "ha[d] already paid the flight and the apartment fees, and

beginning in mid-June may mean[] that the apartment will not be available anymore. We'll already [sic] lose the payment . . . ." *Id.* But for the representations made about the Syncada Project still moving along, Geodesic would not have had Rojano in Birmingham on May 1st. Geodesic made the final arrangements for Rojano after March 15th. It is therefore reasonable to conclude Geodesic would not have expended the resources it did in efforts to move Rojano internationally had Compass disclosed the March 15th email news.

Evaluating these factors and considering the applicable law, the Court concludes Geodesic has presented enough evidence that a reasonable jury could find a duty to disclose. As such, summary judgment is inappropriate on Count IV.

## C. Fraud

In Count V, Geodesic alleges Compass represented that Rojano needed to be relocated to the U.S. to work on the Syncada Project, it justifiably relied on those representations, and it was damaged by Compass' conduct. In order to prove a promissory fraud claim, Geodesic must establish: "(1) a false representation; (2) of a material existing fact; (3) reasonably relied upon by [Geodesic]; (4) who suffered damage as a proximate consequence of the misrepresentation . . . ; (5) proof that at the time of the misrepresentation, [Compass] had the intention not to perform the act promised; and (6) proof that [Compass] had an intent to deceive*." Southland*

*Bank v. A&A Drywall Supply Co.,* 21 So. 3d 1196, 1210 (Ala. 2008) (internal citations omitted). Geodesic has presented evidence sufficient to establish the first four elements as discussed *supra*. The question then becomes whether Geodesic has submitted enough evidence to establish: (5) an intention not to perform and (6) intention to deceive.

The emails in the record show that from March 15th forward, Kore continually represented to Luna that he saw no reason why the contract would not be signed. These representations continued until two weeks before Rojano was due in the U.S. for kickoff. Geodesic has provided evidence Kore had reason to not let Luna know of the depth of the difficulties in contracting with Syncada, including the "show-stopper" information, because he considered Rojano valuable and wanted to be sure to not to lose him. (*See* Kore Dep. 177-79; Doc. 47 Ex. 43.) In an April 4th, 2013, email to Courtney Huesman, Kore stated, "There is a risk of losing [Rojano] if we do not engage (tie up) . . . ." *Id.* Additionally, evidence in the record shows Kore shared information, and was often in communication with Rojano instead of with Luna, which Geodesic avers is indicative of an intention to deceive. (Kore Dep. 227-80.) This circumstantial evidence is sufficient for Geodesic to maintain its fraud claim. *See Byrd v. Lamar*, 846 So. 2d 334, 347 (Ala. 2002) ("Circumstantial evidence is appropriate proof of a present intent not to

perform in a promissory-fraud case."). As such, Geodesic has provided enough evidence to avoid summary judgment on Count V.

### D. Breach of Master Services Agreement & the Non-Disclosure Agreement

In Counts VI & VII, Geodesic asserts that the procurement of Rojano by Compass via Nfoque for the Basel III Project and Compass' active assistance of Rojano in setting up Nfoque as an approved vendor on its internal ARIBA system with full knowledge that he was an employee of Geodesic was a violation of both the MSA and the NSA agreements. Evidence supplied in the record supports such an assertion. While Compass insists it never solicited nor hired Rojano, on July 18, 2013, Kore emailed Shawn Bowles asking if Compass could hire a consultant from Geodesic—Rojano. (Kore Dep. 95-98.) In his response, Bowles even quotes the pertinent portion of the NSA, section 16—which prohibits Compass from doing so. (Doc. 47-3, Ex. 25.) Additionally, Rojano and Kore were in communication regarding his continued employment with Compass via Nfoque before his separation from Geodesic. Next, numerous emails were exchanged between Rojano and various Compass employees regarding Nfoque's registration during Rojano's employment with Geodesic. (Doc. 86-2 at 73-93.) An email as early as August 16, 2013, evidences an inquiry from Rojano about Nfoque's status in Compass' ARIBA system (*Id.*; Doc. 89-2, Ex. 2 at 51) and later emails confirm Rojano's successful

registration of Nfoque in Compass' ARIBA system the week before he began working for them. Additionally, it is uncontroverted that Rojano began work for Nfoque the Monday after leaving Geodesic. (Doc. 47-6, Ex. D at 111.)

The MSA also includes a provision regarding payment. (Doc. 47-3, Ex. 24.) Section 8(c) of the MSA provides, "Compass will pay all accounts due under this Agreement net forty-five (45) days from its receipt of an invoice." Geodesic was not paid for five months. Despite Geodesic's request for payment by wire transfer and Compass' ability to do so, Compass instead issued checks that were subsequently dishonored. (*See* Kore Dep. at 316-18.) A reasonable jury could find this was a breach of an MSA provision.

Compass insists Geodesic cannot demonstrate any damages from Compass' alleged breach of contract for Rojano's work on the Basel III Project. However, Kore testified that sums paid by Compass to Nfoque for Rojano's work would have been paid to Geodesic but for Rojano's transition to Nfoque. (Kore Dep. at 309-12.) (Doc. 89 ¶ 78.) This evidence suffices to show damage to Geodesic.

In the aggregate, a jury could find in Geodesic's favor regarding breach of the MSA and the NDA agreements thus precluding summary judgment on counts VI and VII.

### E.    Breach of Contract

In Count II of its second amended complaint, Geodesic alleges that Compass' failure to pay the $35,840.00 for Invoice No. 6 amounts to a breach of contract pursuant to the purchase orders and invoices and also a violation of Compass' own policies and procedures. As stated above, those claims are for a jury to decide and summary judgment is inappropriate on that claim.

### F.     Count III—Tortious Breach of Contract

A tort-like cause of action for the breach of a duty created by contract is not recognized in Alabama. Indeed, "a negligent failure to perform a contract . . . is but a breach of the contract." *Vines v. Crescent Transit Co.*, 85 So. 2d 436, 440 (Ala. 1956); *see also Barber v. Bus. Prods. Ctr.*, 677 So. 2d 223, 228 (Ala. 1996) ("a mere failure to perform a contractual obligation is not a tort"). As such, Geodesic cannot maintain its claim for tortious breach of contract and summary judgment is due to be granted as to Count III.

### IV.    Conclusion

Geodesic has presented substantial evidence demonstrating there are genuine issues of material fact for each of their claims except Count III. A reasonable jury could render a verdict in their favor regarding all other claims. Consequently, Compass' renewed motion for summary judgment (doc. 84) is due

to be DENIED as to all claims except Count III.[5] A separate order consistent with this opinion will be entered.

      **DONE** and **ORDERED** on October 30, 2017.

L. Scott Coogler
United States District Judge

190685

---

[5] Because this Court declined to consider the disputed evidence and arguments that are the subject of the Defendant's motion to strike (Doc. 92) in ruling on the instant motion for summary judgment, that motion is due to be terminated as moot.